IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **ROSE HUFFMEYER** | § | **CIVIL ACTION NO.: 4:19-cv-3587** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| **PLANNED PARENTHOOD – GULF COAST, INC.** | § | **JURY DEMANDED** |
| **Defendant.** | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

**TO THE HONORABLE DISTRICT COURT JUDGE**:

Plaintiff Rose Huffmeyer ("Ms. Huffmeyer" or "Plaintiff") files this Original Complaint for causes of action stated below, complains of and about Defendant Planned Parenthood – Gulf Coast, Inc. ("PPGC" or "Defendant"), and will show onto the Court as follows:

### I.   PARTIES

1. Plaintiff Rose Huffmeyer is a U.S. Citizen residing in Harris County, Texas.

2. Defendant Planned Parenthood – Gulf Coast, Inc., is a Domestic Nonprofit Corporation authorized to conduct business in the State of Texas. Defendant may be served with process by serving its registered agent, Melaney Linton, at 4600 Gulf Fwy. Houston, Texas 77023, USA.

### II.   JURISDICTION

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (2018). Plaintiff's causes of action arise under a federal statute, namely, Title VII of the Civil Rights act of 1964, 42 U.S.C.

§ 2000e-2(a)(1), and Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.

4. Additionally, this Court has supplemental jurisdiction over Plaintiff's similar State law claims pursuant to 28 U.S.C. § 1367, because such claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution. Plaintiff's supplemental jurisdiction claims arise under the Texas Commission on Human Rights Act, which is codified in Chapter 21 of the Texas Labor Code, Texas Labor Code § 21.001 et seq. ("TCHRA").

5. Venue is proper in the Southern District of Texas - Houston Division pursuant to 28 U.S.C. § 1391(a), because this is the judicial district where all or a substantial part of the events or omissions giving rise to the claim occurred.

### III. NATURE OF THE ACTION

6. This is an action brought pursuant to Title VII and TCHRA on the grounds that Plaintiff, Rose Huffmeyer, was discriminated against, retaliated against, and subjected to a hostile work environment on the basis of her race and national origin in violation of Title VII. The action is to correct and recover for Defendant's unlawful employment practices, including the retaliation against Plaintiff for Plaintiff's participation in protected activities, such as complaining of workplace discrimination and retaliation.

7. This is also an action to correct and recover for Defendant's violations of TCHRA. Specifically, Plaintiff complains that Defendant discriminated and retaliated against her (1) on the basis of the perception of race and national origin; and (2) for engaging in protected activities. *See* TEX. LAB. CODE § 21.001 *et seq*.

8. This is an action is further brought pursuant to Civil Rights Act of 1866, as

amended, 42 U.S.C. § 1981 to correct and recover for Defendant PPGC's unlawful and discriminatory employment practices directed at Plaintiff because of Plaintiff's race (Asian) and national origin (Vietnamese).

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. On July 19, 2018, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") against Defendant for discrimination based on race and national origin and for retaliation against Plaintiff for participating in protected activities (Charge No. 451-2018-05415).

10. Subsequently, the EEOC issued Plaintiff with a Notice of Right to Sue, dated August 15, 2019. Plaintiff files this lawsuit within ninety (90) days of receiving the said notice. Therefore, this lawsuit is timely filed.

11. No administrative exhaustion or other conditions precedent are required prior to the filing of claims under 42 U.S.C. §1981.

## V. FACTS

12. Ms. Huffmeyer is a highly qualified and skilled Laboratory Manager. She holds a Bachelor of Science Degree in Medical Technology from UTMB and has over 28 years of experience working as a Medical Technologist, Laboratory Coordinator, QC/QA, and Laboratory Manager.

13. Ms. Huffmeyer was hired by PPGC on October 22, 2007, as a Lab Supervisor. Her duties included supervising up to thirteen regional medical satellite laboratories. She very successfully worked in that capacity and improved overall quality of laboratory by improving the record keeping practices and training throughout the region under her oversight.

14. When she began working for PPGC, Ms. Huffmeyer was supervised by Ms. Bonnie Smith, Vice President, Clinical Operations. On March 21, 2008, Ms. Huffmeyer was involved in the first inspection of the main PPGC laboratory by a Clinical Laboratory Improvement Act ("CLIA") state inspector. The laboratory received many deficiency notes, due to its predecessor having organizational shortcomings, and Ms. Huffmeyer made it her mission to improve the outcomes and to reach the "zero deficiencies" finding in the following inspections. She then proceeded to modernize and improve laboratory procedures and instruments, which actions upgraded the lab environment, sped up the delivery of laboratory results, and improved reliability throughout PPGC facilities. As a result of Ms. Huffmeyer's effort, the laboratory passed all subsequent CLIA inspections with flying colors, with no deficiencies noted or found by the inspectors.

15. Ms. Huffmeyer's exemplary performance is evidenced by her first annual evaluation. On October 24, 2008, Ms. Huffmeyer received a Meets Expectations/Exceeds Expectations grade on her review. For the next nine years, she continued to receive the same grade and demonstrated equally exceptional level of performance. She was on her way to building a very successful career with PPGC. However, reporting PPGC's repeated violations of the federal statutes prohibiting discrimination against her on the basis of her race and national origin resulted in Ms. Huffmeyer being stripped of the ability to flourish at PPGC and ultimately led to her termination.

16. Ms. Huffmeyer had been the Lab Manager at PPGC for ten years prior to her termination. Six CLIA inspections were conducted during that time, the last five of which found

no performance deficiencies, thanks to the performance improvement plan devised and implemented by Ms. Huffmeyer.

17. Ms. Huffmeyer worked under Ms. Bonnie Smith for nine out of her ten years with PPGC. For eight months following Ms. Smith's departure, Ms. Huffmeyer was supervised by Ms. Laura Thomas. Both supervisors made it clear that Ms. Huffmeyer was doing an exceptional job. Not only had Ms. Huffmeyer saved PPGC a great deal of money by negotiating lower prices on laboratory equipment, reagents, and contracts; she had further improved laboratory procedures, increased laboratory's efficiency, and reduced the number of laboratory errors and sample turnaround time during her tenure at PPGC. There had never been a question that she was qualified for her job and that she was doing it well. In fact, her exceptional performance was duly noted, and in June 2010 she was promoted to the position of Laboratory Manager.

18. At the end of August 2017, PPGC assigned a new supervisor to oversee Ms. Huffmeyer's performance, Ms. Melissa Farrell. Following that appointment, Ms. Huffmeyer's workplace quickly turned into a living nightmare. Not only did Ms. Farrell persistently belittle Ms. Huffmeyer; she also resorted to treating her so badly that her work environment quickly became sufficiently hostile to start causing her health to deteriorate, all because of Ms. Huffmeyer's race and national origin. Among other health issues, Ms. Huffmeyer developed daily headaches and fever blisters.

19. The problems with Ms. Farrell began from the very first days following her assumption of the position of Ms. Huffmeyer's supervisor. On August 16, 2017, Ms. Huffmeyer met with her to discuss Ms. Farrell's expectations of Ms. Huffmeyer's performance. Because Ms. Huffmeyer had enjoyed great and honest relationships with her previous supervisors, she adopted

the same open and earnest approach with Ms. Farrell. However, it immediately transpired that such honesty would not be appreciated, and that Ms. Farrell's goals were far from focused on running the laboratory. Ms. Farrell told Ms. Huffmeyer that she did not want to get involved with the laboratory because it could cause a conflict with her duties at the Research Department at the outset. She then made it clear that she only wanted the lab position in order to secure a promotion to the level of a Vice President. At the same time, Ms. Farrell assured PPGC's Board that she could make a lot of money for PPGC if the laboratory reported to her. Ms. Huffmeyer was dismayed by Ms. Farrell's attitude, which not only demonstrated a lack of care for the laboratory employees but also raised ethical and legal concerns. On September 1, 2017, Ms. Farrell got the promotion she sought and became PPGC's Research Vice President.

20. At their very first meetings, Ms. Farrell demonstrated that she held a particular disdain for Ms. Huffmeyer, which differed drastically from the way she treated her other supervisees. For instance, on September 6, 2017, Ms. Farrell told Ms. Huffmeyer to send her a price for a Beta HCG Instrument. Ms. Huffmeyer contacted six different companies and obtained prices from each one of them. Ms. Farrell then asked Ms. Huffmeyer to draft a flow sheet with the technical information and prices so that she could present it to the Board. Ms. Farrell acknowledged at that time that she had no knowledge whatsoever about the lab and its inner workings.

21. Following the request, Ms. Farrell commenced harassing Ms. Huffmeyer daily, demanding updates on the status of the flowsheet, even though Ms. Huffmeyer explained to Ms. Farrell numerous times that she was waiting for a price from one of the vendors. Ms. Huffmeyer earnestly assured Ms. Farrell that the delay was caused by the factors outside of her control. Ms.

Farrell responded with a complete lack of patience and tact, both personal and professional, and instead informed Ms. Huffmeyer that she "expect[ed] [the flowsheet] NOW!" She also made it clear to Ms. Huffmeyer that she had "better not make [Ms. Farrell] look bad!" This kind of hostility became a part of Ms. Huffmeyer's daily routine. Ms. Farrell never toned it down or let Ms. Huffmeyer catch her breath, which soon resulted in Ms. Huffmeyer's health deteriorating.

22. Not only did Ms. Farrell abuse Ms. Huffmeyer without cause as to her work; she also made inappropriate comments about her national origin. Ms. Farrell once asked Ms. Huffmeyer how "close" she was to Ms. Tram Nguyen (the Director of the PPGC Center for Choice), just because both Ms. Huffmeyer and Ms. Nguyen were Vietnamese. Essentially, Ms. Farrell assumed that two unrelated people would immediately form a clique in their workplace, just because they both happen to be of Vietnamese origin. Ms. Huffmeyer told Ms. Farrell that she did not know Ms. Nguyen well at all. Ms. Farrell responded by stating that she did not trust Ms. Nguyen and that Ms. Huffmeyer should not trust her either. When Ms. Huffmeyer tried to reassure Ms. Farrell that her only goal was to make sure she looked good, Ms. Farrell dismissed her, saying, "I'm not sure about that! Birds of a feather…!" This conversation, coupled with Ms. Farrell's other inappropriate behavior directed at her, made Ms. Huffmeyer reasonably conclude that Ms. Farrell had a problem with Vietnamese people generally, regardless of their qualifications or standing within PPGC, and that Ms. Farrell was singling out Vietnamese people based on her own preconceived notions about them.

23. On September 19, 2017, Ms. Huffmeyer went to Ms. Farrell's office for a meeting which was scheduled for 1:00 p.m. Ms. Huffmeyer arrived on time, but Ms. Farrell was not in her office. Ms. Huffmeyer then went back to the laboratory to help out a technician who sought her

7

*Plaintiff's Original Complaint*

out immediately prior to the meeting. She spent a total of ten minutes in the laboratory and went back to Ms. Farrell's office. Ms. Farrell was furious that she did not find Ms. Huffmeyer in the office upon her tardy arrival. She proceeded to berate Ms. Huffmeyer, screaming "next time when I am not here, I expect you to STAY IN THE HALLWAY AND WAIT FOR ME. YOU ARE NOT SUPPOSED TO WALK OFF!" at Ms. Huffmeyer at the top of Ms. Farrell's lungs. No one else under Ms. Farrell's supervision had ever been treated that way. Nor did Ms. Farrell allow herself to belittle or berate any of her non-Vietnamese supervisees.

24. Similarly, on October 31, 2017, Ms. Huffmeyer was speaking to Ms. Farrell about the difficulties in the Baton Rouge and New Orleans offices of Planned Parenthood. Ms. Farrell asked Ms. Huffmeyer for recommendations on improving those offices' performance. Ms. Huffmeyer told Ms. Farrell that PPGC needed to take a "correction action." Ms. Farrell immediately lost her temper and yelled, "Rose, it is corrective action! It is so annoying that you can't speak [. . .] English." Granted, English is not Ms. Huffmeyer's first language, however, that had never been an issue prior to Ms. Farrell's appointment. Nor did any of her previous supervisors allow themselves to scream at Ms. Huffmeyer for a minor grammatical mishap.

25. On December 5, 2017, Ms. Farrell and Ms. Pam Whitaker, PPGC's V.P. of Human Resources, came into Ms. Huffmeyer's office unannounced to hold a meeting. During the meeting, Ms. Huffmeyer again raised the issue of discrimination and specifically complained that she was treated differently by Ms. Farrell because of Ms. Huffmyer's being Vietnamese. Ms. Farrell walked out of the meeting before Ms. Huffmeyer had an opportunity to complete her description of Ms. Farrell's discriminatory behavior. However, Ms. Whitaker informed Ms. Huffmeyer that

8

*Plaintiff's Original Complaint*

she believed her side of the story, given that Ms. Huffmeyer was courageous enough to present it in front of Ms. Farrell.

26. On December 6, 2017, a day after Ms. Huffmeyer raised the issue of discrimination with Ms. Whitaker, Ms. Farrell unexpectedly informed Ms. Huffmeyer that she was being demoted from the full-time to the part-time employee status. Ms. Farrell justified the demotion by saying that Ms. Huffmeyer's previous supervisor, Ms. Smith, had noted that Ms. Huffmeyer's job was part-time. In fact, Ms. Huffmeyer herself once asked Ms. Smith to have her position converted to a part-time one, which was met with a resounding "no." Ms. Smith elaborated that Ms. Huffmeyer's job was a full-time one, that the State of Texas specifically required Ms. Huffmeyer's position to be full-time, that the description classified the job as exempt, and that it had always been and would always be a full-time position, even if Ms. Huffmeyer was allowed to work from home. Ms. Huffmeyer continued to work-full-time, despite the December 6 conversation taking place, through to her termination.

27. Ms. Farrell, however, did take away Ms. Huffmeyer's ability to work remotely and insisted on Ms. Huffmeyer's presence in the office for the entirety of her working day. At the same time, non-Vietnamese employees of PPGC, namely, Ms. Debbie Dean, Ms. Lashonda Crane, Ms. Jackie Kinabrew, and Ms. Farrell herself were all allowed to work from home whenever they desired.

28. On December 11, 2017, not seeing any improvement in Ms. Farrell's behavior subsequent to her complaint to Ms. Whitaker, Ms. Huffmeyer sent a letter restating her complaints to Ms. Whitaker, Jeffrey Palmer, PPGC's Chief Operating Officer, Dr. Schutt-Aine, Ms. Thomas, and Ms. Farrell. She restated that she was being discriminated against on the basis of her race and

9
*Plaintiff's Original Complaint*

national origin. PPGC did little to address her complaints or to alter its practices in response to the second complaint.

29. Instead of seeing her working conditions improve, Ms. Huffmeyer was unceremoniously terminated, just over three months after the complaint was filed, without any respect for the ten years of impeccable service she delivered to the Company.

30. Even though PPGC replaced Ms. Farrell with a different supervisor, Ms. Jackie Kinabrew, shortly after Ms. Huffmeyer sent the letter mentioned above, Ms. Huffmeyer's working conditions worsened further instead of being improved, as one would expect following a discrimination investigation. In fact, the evidence will show that PPGC clearly made an executive decision to terminate Ms. Huffmeyer following her written complaint, in retaliation for Ms. Huffmeyer's pursuit of her protected rights. Not only was Ms. Farrell's replacement incompetent to be in a lab supervisory position, due to her compete lack of knowledge or understanding of lab procedures. Ms. Farrell's replacement was also intent on finding or, if necessary, inventing deficiencies in Ms. Huffmeyer's performance sufficient, in the eyes of PPGC, to justify Ms. Huffmeyer's termination under a non-discriminatory pretext. It is of note that throughout the three months preceding her termination, Ms. Huffmeyer was asked numerous times whether she was going to quit her job by Ms. Kinabrew and Ms. Thomas. When PPGC realized that its solicitations would not bear fruit, PPGC approached Ms. Huffmeyer with a severance offer seeking to get rid of both her and the prospects of this litigation by offering Ms. Huffmeyer a generous amount of money for giving up her right to sue for discrimination.

## VI.   TITLE VII RACE DISCRIMINATION

31. Plaintiff incorporates by reference all of the foregoing allegations in each of the

10
*Plaintiff's Original Complaint*

paragraphs above as if fully set forth herein.

32. Defendant intentionally engaged in unlawful employment practices of discriminating against Plaintiff on the basis of Plaintiff's race and national origin.

33. Plaintiff is a member of a protected class, namely Vietnamese and Asian, clearly qualified for the position she was holding with Defendant.

34. Plaintiff was subjected to adverse employment actions, namely, discriminated against in connection with the compensation, terms, conditions, and privileges of employment, as well as limited, segregated, or classified in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status on the account of Plaintiff's race (Asian), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

35. Defendant's non-Asian employees were treated more favorably, compared to Plaintiff.

## VII.   TCHRA RACE DISCRIMINATION

36. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

37. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her race (Asian).

38. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status because of Plaintiff's race (Asian), in violation of Texas Labor Code § 21.051 *et seq*.

## VIII.   TITLE VII NATIONAL ORIGIN DISCRIMINATION

39. Plaintiff incorporate by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

40. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her national origin.

41. Plaintiff was subjected to adverse employment actions, namely, discriminated against in connection with the compensation, terms, conditions, and privileges of employment, as well as limited, segregated, or classified in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status on the account of Plaintiff's national origin (Vietnamese), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

42. Non-Vietnamese employees of Defendant were treated more favorably and were not subjected to disparate treatment in the same or similar circumstances.

## IX.   TCHRA NATIONAL ORIGIN DISCRIMINATION

43. Plaintiff incorporate by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

44. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her national origin (Vietnamese).

45. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status because of Plaintiff's national origin (Vietnamese), in violation of

Texas Labor Code § 21.051.

## X.  SECTION 1981 RACIAL DISCRIMINATION

46. Plaintiff hereby incorporate by reference all of the allegations contained in the above-identified paragraphs as though fully set forth herein.

47. Pursuant to 42 U.S.C. §1981 Plaintiff pleads a cause of action against the Defendant for racial discrimination.

48. Plaintiff was treated differently than other employees that are not of Asian descent. Defendant engaged in discrimination against Plaintiff, an Asian female, by terminating her, harassing her in her workplace, and making her work environment hostile solely or predominantly because of Plaintiff's race and national origin, thus depriving Plaintiff of equal employment opportunities and otherwise adversely affecting her status as an employee. As a result of Defendant's discrimination, Plaintiff suffered damages (in an amount that is within the jurisdictional limits of this Court).

## XI.  TITLE VII RETALIATION

49. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

50. Plaintiff engaged in activities protected by applicable federal and state law, namely, reported discrimination at the hands of Defendant on the basis of race and national origin.

51. Defendant intentionally retaliated against Plaintiff because of the said complaints of race and national origin discrimination made to Defendant prior by demoting and terminating Plaintiff.

## XII.  TCHRA RETALIATION

52. Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

53. Defendant intentionally retaliated against Plaintiff because of the complaints of discrimination made to Defendant in violation of the Texas Labor Code § 21.055.

## XIII. SECTION 1981 RETALIATION

54. Plaintiff hereby incorporates by reference all of the allegations contained in the above-identified paragraphs as though fully set forth herein.

55. Pursuant to 42 U.S.C. § 1981, Plaintiff pleads a cause of action against Defendant for retaliation. Defendant intentionally retaliated against Plaintiff because she complained to Defendant about the race and national origin discrimination she experienced while employed by Defendant.

56. After Plaintiff's protected complaints of the racially discriminatory actions by Defendant, Plaintiff was subjected to a hostile work environment and subsequent termination, in violation of 42 U.S.C. §1981. As a result of Defendant's retaliation, Plaintiff suffered damages (in an amount that is within the jurisdictional limits of this Court).

## XIV. JURY DEMAND

57. Plaintiffs demand a jury on all issues to be tried in this matter. Plaintiff submits the jury demand and herein submit the jury fee.

## XV. PRAYER

58. WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

a. All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or any amendments hereto, including but not limited to back pay, future wages, reinstatement, upgrading, and compensation for benefits not received;

b. Compensatory damages, including, but not limited to, emotional distress;

c. Past, present, and future physical pain and mental suffering;

d. Punitive damages;

e. Reasonable attorneys' fees, as allowed by law (with conditional awards in the event of appeal);

f. Pre-judgment interest at the highest rate permitted by law;

g. Post-judgment interest from the judgment until paid at the highest rate permitted by law;

h. Costs of Court; and

i. Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any proper amendments thereto.

[SIGNATURE PAGE TO FOLLOW]

Respectfully submitted,

**kennard law P.C.**

_____
Alfonso Kennard, Jr.
Texas Bar No. 24036888
S.D. ID 713316
2603 Augusta Dr., Suite 1450
Houston, Texas 77057
Telephone: (713) 742-0900
Facsimile: (713) 742-0951
Email: alfonso.kennard@kennardlaw.com
**ATTORNEY-IN-CHARGE FOR PLAINTIFF**